**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**      ) | |
|      ) | |
| **v.**      ) | **Criminal Action No. 2024-0008** |
|      ) | |
| **DAVIDSON LEE CHARLEMAGNE and**      ) | |
| **SASHA CHARLEMAGNE,**      ) | |
|      ) | |
| **Defendants.**      ) | |
| ——————————————————————) | |

**Attorneys:**
**Adam F. Sleeper, Esq.**
**Denise N. George, Esq.**
**Cherrisse R. Amaro, Esq.**
St. Thomas, U.S.V.I.
    *For the United States*

**David J. Cattie, Esq.**
St. Thomas, U.S.V.I.
    *For Davidson Lee Charlemagne*

**Pamela L. Colon, Esq.**
St. Croix, U.S.V.I.
    *For Sasha Charlemagne*

**Annabelle N. Nadler, Esq.**
Miami, Fl.
**Scot F. McChain, Esq.**
St. Croix, U.S.V.I.
    *For Intervenor Morris Anslemi*

**MEMORANDUM OPINION AND ORDER**

**Lewis, Senior District Judge**

THIS MATTER comes before the Court on the Government's "Motion for Leave to File Under Seal" (Dkt. No. 247); Defendant Davidson Lee Charlemagne's ("D. Charlemagne") response thereto (Dkt. No. 248); the Government's "Memorandum Addressing its Objections to the Line of Questioning in Cross Examination" (Dkt. No. 250); Defendant Sasha Charlemagne's

("S. Charlemagne") (Dkt. No. 253) and D. Charlemagne's (Dkt. No. 251) responses thereto; D. Charlemagne, S. Charlemagne, and the Government's "Joint Delegation of Relevant Portions of the Deposition Transcripts" (Dkt. No. 252); the Government's "Reply to Defendants' Responses to Government's Memorandum" (Dkt. No. 255); the oral arguments made before this Court on May 16, 2025; D. Charlemagne and S. Charlemagne's (together, "Defendants") "Joint Defense Response to Court's Order Regarding Subject Areas of Cross Examination of Morris Anselmi" (Dkt. No. 264); Intervenor Morris Anselmi's ("Anselmi") "Response to Defendant[s'] Proposed Areas of Cross Examination" (Dkt. No. 270); and the Government's "Response to Defendants['] Proposed Cross Examination Questions" (Dkt. No. 272).

For the reasons discussed below, the Court finds that the Immunity Agreement provided to Anselmi in this matter is not co-extensive with his Fifth Amendment privilege. Accordingly, Anselmi retains the right to assert his privilege against self-incrimination. The Court further finds that, based on its evaluation of each area of inquiry on which Defendants have indicated they seek to cross-examine Anselmi, the introduction of Anselmi's testimony at trial without allowing cross-examination on the issues that the Court has determined appropriate for examination would constitute a violation of Defendants' Sixth Amendment rights. Finally, the Court finds that the filings pertaining to the issue of Anselmi's cross-examination which contain privileged information—specifically, Dkt. Nos. 250, 251, 252, 253, 264, 270, and 272—and the portions of the instant opinion that contain details regarding Anselmi's deposition questions or previously sealed information will remain or be placed under seal, as applicable, pending further Order of the Court.

# I.    BACKGROUND

## A.    Procedural History

In a Second Superseding Indictment ("SSI") (Dkt. No. 124)[1] filed on December 14, 2024, D. Charlemagne was charged with fraud concerning programs receiving federal funds (18 U.S.C. § 666(a)(1)(A)); wire fraud (18 U.S.C. § 1343); false claims upon the United States (18 U.S.C. § 287); and conspiracy to launder money (18 U.S.C. §§ 1956(h) and 1957). In that same Indictment, S. Charlemagne was charged with false claims upon the United States (18 U.S.C. § 287); conspiracy to launder money (18 U.S.C. §§ 1956(h) and 1957); and wire fraud (18 U.S.C. § 1343). *Id*. at 12-19. In support of these charges, the Government alleges that, at the urging of D. Charlemagne, Anselmi and D. Charlemagne submitted a bid to the Virgin Islands Housing and Finance Authority ("VIHFA") through Island Services Group ("ISG")—a business enterprise owned by Anselmi—for a contract to store building materials.[2] *Id*. at ¶8. Under the contract, D&S Trucking—a business enterprise owned by Defendants, who are husband and wife—was slated to be ISG's subcontractor and would be "essentially doing all of the work required under the terms of the contract." *Id*. D&S Trucking would receive approximately 87% of each payment from VIHFA, and ISG would receiving the remaining approximately 13%. *Id*. The SSI charges that, in their performance of the building material contract, Defendants inflated labor costs while performing a minimal amount of work, and submitted falsified timesheets to the VIHFA. *Id*. at ¶¶ 9, 22-32, 43-44. Since 2021, it is alleged that Defendants have made approximately $3,177,000 in profit from the building material contract. *Id*. at ¶44.

---

[1] Charges were first brought against Defendants in an Indictment filed on June 11, 2024. (Dkt. No. 1)

[2] Anselmi is identified in the SSI as "Individual One."

In a separate matter, an Indictment (Dkt. No. 1) was filed on February 20, 2024 against Anselmi and a co-defendant, Kimberly McCollum ("McCollum") (Case No. 24-cr-0004) ("PPP Indictment"). According to the PPP Indictment, Anselmi and McCollum are co-owners of ISG. *Id.* at ¶ 2-3. The Government alleges that Anselmi and McCollum applied for a forgivable Paycheck Protection Program loan ("PPP loan")—offered under the Coronavirus Aid, Relief, and Economic Security Act—for their business, ISG, only to transfer large sums of the money received from this loan to McCollum's personal bank account. *Id.* at ¶ 5, 14-20. The Government further alleges that McCollum and Anselmi submitted falsified statements in the form of loan forgiveness applications to the federal government, claiming that the proceeds from the loan were used for authorized purposes. *Id.* at ¶ 22-23. More specifically, the PPP Indictment alleges that Anselmi and McCollum "devised a scheme and artifice to defraud the United States, through the SBA, and United Fidelity Bank" by: 1) obtaining benefits in the form of PPP loans from United Fidelity Bank; 2) siphoning a portion of the PPP loan proceeds to McCollum's personal bank accounts; and, 3) submitting to the SBA applications for forgiveness of the PPP loans which claimed that the loan funds had been used for authorized purposes, when, in reality, a portion of the loan funds had been used for McCollum's personal enrichment. *Id.* at ¶ 13. The PPP Indictment charges Anselmi with wire fraud conspiracy (18 U.S.C. § 1349) and false statements to the SBA and a financial institution (18 U.S.C. § 1014). *Id.* at 7, 9-10. McCollum is charged with wire fraud conspiracy (18 U.S.C. § 1349), wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), and false statements to the SBA and a financial institution (18 U.S.C. § 1014). *Id.* at 7-9. McCollum was arraigned on the PPP Indictment on February 28, 2024. (Dkt. No. 16). As of the date of this Opinion, Anselmi has not been arraigned due to his ongoing medical issues.

On March 20, 2025, the Government filed a motion in the instant matter, pursuant to Fed. R. Crim. P. 15(a), to take a videotaped deposition of Anselmi—a prospective prosecution witness—to preserve his testimony for the trial in this matter due to his serious medical issues. (Dkt. No. 223 at 1). Neither D. Charlemagne nor S. Charlemagne filed an opposition to the motion. Following argument before Magistrate Judge Emile A. Henderson III on March 21, 2025 (Dkt. No. 225), Defendants filed a joint motion on March 25, 2025 seeking permission to take a virtual videotaped deposition of Anselmi in order to preserve his testimony for trial in light of his expected unavailability. (Dkt No. 231). In so moving, Defendants acknowledged Anselmi's "serious, critical life-threatening health condition . . . as evidenced in uncontroverted court records and medical documentation." (Dkt No. 231 at 1). Magistrate Judge Henderson granted the requests of the Government and both Defendants to depose Anselmi, ordering that the deposition occur in sessions of not more than two hours due to Anselmi's health concerns. (Dkt. No. 232 at 6, 8; Dkt. No. 233 at 3, 5). At the second of these deposition sessions, a dispute arose as to the extent to which Anselmi could be cross-examined regarding the PPP Indictment. The parties are in agreement that the Court must resolve the dispute before the deposition can continue. (Dkt. No. 240, 242, 243).

### B.    The Parties' Dispute

There are three issues before the Court: (1) whether the Immunity Agreement provided to Anselmi is coextensive with his privilege against self-incrimination such that he is compelled to answer questions posed to him regarding the PPP Indictment; (2) whether it is permissible for Defendants to question Anselmi as to their identified areas of inquiry, and if so, does Anselmi's refusal to answer these questions create a violation of Defendants' rights pursuant to the Sixth

Amendment Confrontation Clause; and (3) whether the filings pertaining to the issue of Anselmi's Rule 15 deposition should be sealed.[3]

The essence of the parties' dispute concerns the scope of the Immunity Agreement between Anselmi and the Government; the impact of the Immunity Agreement on permissible cross-examination of Anselmi regarding the PPP Indictment and in light of his Fifth Amendment rights; and any bearing of the Immunity Agreement on Defendants' right to cross-examination under the Sixth Amendment. Each of these areas will be addressed in turn.

## II. Interpretation of Immunity Agreement and Privilege Against Self-Incrimination

Underlying the dispute are the parties' conflicting positions. The Government objects "to all [questions Defendants may ask] about the facts, circumstances, details, expectations and charges" in *U.S.A. v Morris Anselmi*, as these are not "covered under the use immunity agreement protecting [Anselmi] from self-incriminating testimony in [*United States v. Davidson Charlemagne, et al.*] in which he is testifying." (Dkt. No. 250 at 1-2). In its reply, the Government refers to the Immunity Agreement as a contract, asserting that "the mutual assent of the parties to the contract" controls. (Dkt. No. 255 at 1).

There is no dispute between the parties to the Immunity Agreement (Anselmi and the Government)—as represented by their respective counsel—that the Immunity Agreement is limited to testimony regarding "the subject matter of this case[,] and none other." *Id*. The Government argues that the Court should therefore honor this understanding by narrowly

---

[3] The Government also objected—pursuant to Rules 608 and 609 of the Federal Rules of Evidence—to any reference which might be made to the PPP Indictment for purposes of impeaching Anselmi. (Dkt. No. 250 at 3). Defendants responded, and the issue was fully briefed. (Dkt. No. 251 at 4; Dkt. No. 253 at 17). The Government ultimately chose not to pursue this argument during the course of oral argument on May 16, 2025. Therefore, the Court does not address this issue in the instant Opinion.

construing the Immunity Agreement as not providing Anselmi immunity for the use against him of any testimony, that is not directly related to the "subject matter of the trial." *Id*. The Government asserted at oral argument that the "subject matter of the trial," for which Anselmi is protected by the Immunity Agreement, is limited to Anselmi's business dealings with Defendants in relation to the VIHFA building material contract.

D. Charlemagne argues that Anselmi's Immunity Agreement is much broader, and is not limited to testimony regarding his business relationship with Defendants. Instead D. Charlemagne argues that the Immunity Agreement protects Anselmi from the use against him in this or any other case of any testimony that he gives in the proceedings in this matter. (Dkt. No. 248). As such, Anselmi's testimony in his Rule 15 deposition "can never be used against him except in a case for obstruction/perjury." (*Id*. at 3). Therefore, D. Charlemagne asserts, pursuant to 18 U.S.C. § 6002, that Anselmi may not refuse to testify on the basis of his privilege against self-incrimination. (Dkt. No. 251 at 10). S. Charlemagne makes a concurring argument, stating that Anselmi is testifying pursuant to a complete use Immunity Agreement which bars the use, direct or indirect, of "any [] statement, testimony or information revealed in this [case] by Anselmi against him in any other criminal case." (Dkt. No. 253 at 18).

### A.    Legal Principles

#### 1.    Interpretation of Immunity Agreement

The Court is aware of no binding precedent in which the Third Circuit has found that Immunity Agreements are governed by contract law. However, the Third Circuit has found that similar agreements between witnesses and the Government are aided in the interpretation thereof by contract law, including a non-prosecution agreement (*United States v. Skalsky*, 857 F.2d 172, 176 (3d Cir. 1988)), and a plea agreement (*United States v. Gebbie*, 294 F.3d 540, 551–52 (3d Cir.

2002)). Specifically, the Third Circuit has found that while a plea or cooperation agreement "is not altogether the same as a commercial arrangement, civil contract law is nevertheless an important and useful aid in interpretation." *United States v. Baird*, 218 F.3d 221, 229 (3d Cir. 2000). This body of case law has been interpreted to mean that principles of contract interpretation apply to immunity agreements. *See United States v. Bressi*, No. 4:19-CR-00207, 2024 WL 4583528, at *2 (M.D. Pa. Oct. 25, 2024) (citing *Baird*, 218 F.3d at 229) ("The Court determines the existence and terms of an immunity agreement by reference to contract principles."); *United States v. Stolt-Nielsen S.A.*, 524 F. Supp. 2d 609, 615 (E.D. Pa. 2007) (interpreting *Gebbie* and *Baird* to reflect that the interpretation of immunity agreements is guided by contract law).

The primary goal of contract interpretation is to determine the "mutual intent" of the parties "at the time of contracting." *Southland Gaming of Virgin Islands, Inc. v. Gov't of Virgin Islands*, No. CV 2018-107, 2020 WL 1821016, at *5 (D.V.I. Apr. 10, 2020) (quoting *Illinois Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011); *see also Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 75 (3d Cir. 2011). As "[t]he strongest objective manifestation of intent is the language of the contract," the first step of contract interpretation requires the court to determine whether the relevant language states the parties' intentions clearly or ambiguously. *Baldwin*, 636 F.3d at 76; *Slamon v. Carrizo (Marcellus) L.L.C.*, No. 23-1394, 2024 WL 4602673, at *3 (3d Cir. Oct. 29, 2024); *Atl. Basin Ref., Inc. v. ArcLight Cap. Partners, LLC*, No. CV 2015-0071, 2018 WL 3431974, at *7 (D.V.I. July 16, 2018). To be unambiguous, a contract clause must be "capable of only one objectively reasonable interpretation." *Univ. Spine Ctr. v. Aetna, Inc.*, 774 F. App'x 60, 63 (3d Cir. 2019); *see also Baldwin*, 636 F.3d at 76 (finding a contract provision unambiguous when it is "reasonably capable of only one construction"); *Virgin Islands Mar. Serv., Inc. v. Puerto Rico Mar. Shipping Auth.*, 978 F. Supp. 637, 647 (D.V.I.

1997), *aff'd*, 162 F.3d 1153 (3d Cir. 1998) (finding a contract unambiguous because when each word of the contract is "given its natural meaning without any need for interpretation, implication or importation," there was "only [one] legally acceptable construction").

If the contract is unambiguous, its one reasonable interpretation must be accepted, and the court does not look to extrinsic evidence. *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009). Generally, the scope of a contract must be "discerned within its four corners." *Gov't Emps. Ret. Sys. of Virgin Islands v. Gov't of Virgin Islands*, 995 F.3d 66, 79 (3d Cir. 2021) (quoting *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984)). Separate documents which are expressly incorporated into a contract are considered to fall within the "four corners" of the document, and are not extrinsic evidence. *See C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411, 419-420 (2001); *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975); *Gov't Emps. Ret. Sys. of Virgin* Islands, 995 F.3d at 107 (concurring opinion) (citing 11 Williston on Contracts § 30:25 (4th ed. 2020) ("When a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively a part of the writing, and . . . [t]he incorporated matter is to be interpreted as part of the writing.")) (citing Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 101 (2012) (stating general terms "are to be accorded their full and fair scope" and "are not to be arbitrarily limited")).

If, on the other hand, a contract is "reasonably susceptible to at least two reasonable but conflicting meanings," it is ambiguous. *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 139 (2018)*.* In order to determine whether a contractual provision is ambiguous*,* the Court takes into account the representations of the parties to determine if there are "objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings." *In*

*re New Valley Corp.,* 89 F.3d 143, 150 (3d Cir. 1996) (quoting *Teamsters Indus. Employees Welfare Fund v. Rolls–Royce Motor Cars, Inc.,* 989 F.2d 132, 135 (3d Cir.1993)).  In so doing, the Court may consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *In re TH Props.*, 752 F. App'x 127, 130 (3d Cir. 2018) (citation modified). When a contract is ambiguous, the court must consult extrinsic evidence to determine the parties' intentions. *In re New Valley Corp.,* 89 F.3d at 150. This extrinsic evidence may include "the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." *Id.*

## 2.    Privilege Against Self-Incrimination

For an individual to properly assert his or her right to remain silent—or privilege against self-incrimination—as a basis for not responding to a question, "it need only be evident from the implications of the question [the individual is being asked], in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman v. United States*, 341 U.S. 479, 486–87 (1951). While a witness in a civil proceeding may not invoke a blanket Fifth Amendment privilege, and instead must invoke this right in response to each individual question asked of him or her, in the criminal context the proponent of the privilege is required to make a showing that his or her testimony runs the risk of self-incrimination "only to the limited extent requisite to show that the privilege is properly claimed." *Matter of Grand Jury Empanelled Feb. 14, 1978*, 603 F.2d 469, 477 (3d Cir. 1979*); Nat'l Life Ins. Co. v. Hartford Acc. & Indem. Co.*, 615 F.2d 595, 596 (3d Cir. 1980). The privilege against self-incrimination is "confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman*, 341 U.S. at 486.

In offering immunity to a witness, the Government negates the possibility of the witness having "reasonable cause to apprehend danger" from testifying. *See In re Lane*, 224 F.Supp. 317, 318 (D.C.Ill. 1963). The Supreme Court has found that "immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." *Kastigar v. United State*s, 406 U.S. 441, 453 (1972). However, the standard for overcoming an assertion of silence in fear of self-incrimination is a high one, and the burden is borne by the Government:

> "Once asserted, whether framed in ordinary or technical terms, the burden falls to the government to 'make it 'perfectly clear' that the answers sought 'cannot possibly' tend to incriminate.' . . . That requires resolving any 'ambiguity' and showing that the witness will not run the risk of self-incrimination . . .The Court should have asked the Government to make it 'perfectly clear' any fear was unfounded before ordering [the witness] to testify.

*United States v. Morton*, 993 F.3d 198, 205 (3d Cir. 2021).

### B.    Analysis

The Immunity Agreement between Anselmi and the Government provides, in pertinent part:

> Re: *United States v. Davidson Charlemagne, et al.*, Case No. 24-CR-0008 . . .

> Morris Anselmi, is scheduled to [be] deposed in the above-referenced case. This letter sets forth the terms and conditions of said testimony. Mr. Anselmi has made a proffer of information **regarding the subject matter of the trial.** It appears from the proffer that, by giving truthful answers to our questions, Mr. Anselmi may be required to incriminate himself. Accordingly, in order that Mr. Anselmi can truthfully answer any questions put to him before the Court proceedings, and in any meetings with government agents in connection with or ancillary to such appearances, the United States makes the following representations. . . .

> The United States Attorney's Office for the District of the Virgin Islands will not use any testimony, statements, or other information Mr. Anselmi provides **pursuant to this agreement** or any information directly or indirectly derived from such testimony, statements, or other information to prosecute him in any criminal case, except as substantive evidence in prosecuting him for perjury, . . . making a false statement, . . . or obstruction of justice . . . should he commit one or more of those offenses in the future . . .

> Mr. Anselmi must provide complete and truthful information . . . as well as in any other proceeding related to or growing out of this investigation. Mr. Anselmi must answer all questions **concerning the subject matter of this case** and must not withhold any information.

Dkt. No. 250-1 at 1 (emphasis added).[4]

It is clear from the plain language of the Immunity Agreement that any testimony covered by the agreement, cannot be used, either directly or indirectly, to prosecute Anselmi in any criminal matter, except for certain specifically identified charges. It is also clear that the only testimony covered by the Immunity Agreement is testimony given in a proceeding in the instant case, or "in any other proceeding related to or growing out of the investigation." *See id.* More specifically, Anselmi's immunity under the agreement is limited to testimony he provides regarding "the subject matter of this case."[5]

However, the meaning of the "the subject matter of this case," as used in the Immunity Agreement is unclear. The use of the definite article "the" at the beginning of the phrase "the subject matter of this case" indicates that the parties to the agreement had a definite meaning in

---

[4] The Court interprets the two phrases "the subject matter of this case" and "the subject matter of the trial" to be referring to the same "subject matter," and uses them—as the parties do in their arguments—interchangeably.

[5] The Court reads each individual sentence of the Immunity Agreement in the context of the agreement as a whole. Notably, the subject line of the agreement is "Re: *United States v. Davidson Charlemagne, et al.*, Case No. 24-CR-0008." After referring to the scheduled deposition, the agreement identifies itself as "set[ting] forth the terms and conditions of said testimony." The next sentence notes that the concern that Anselmi's testimony in this matter could lead to self-incrimination comes from the preview of his testimony in the proffer of information Anselmi provided regarding "the subject matter of the trial." Therefore, the testimony for which Anselmi is immunized—in essence, the same information which created the self-incrimination concern— pertains to "the subject matter of this case." Thus, contrary to Defendant's contentions, the agreement does not require Anselmi to answer all questions asked of him in the deposition, but makes this requirement only of questions pertaining to the "subject matter of this case." The Immunity Agreement's reach, therefore, is grounded in information Anselmi provides regarding "the subject matter of this case."

mind "previously specific by context." *See Nielsen v. Preap*, 586 U.S. 392, 408 (2019) ("Grammar and usage establish that 'the' is 'a function word . . . indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context.'") (quoting Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005)); *compare with United States v. Johnman*, 948 F.3d 612, 618 (3d Cir. 2020) ("an indefinite article, 'a' or 'an' 'implies that the thing referred to is nonspecific.'" (quoting Indefinite Article, New Oxford American Dictionary (3d ed. 2010)).[6]

"[T]he subject matter of this case" is clearly meant to be "the subject matter of [*United States v. Davidson Charlemagne*, *et al*., Case No. 24-CR-0008]," as "Re: *United States v. Davidson Charlemagne*, *et al*., Case No. 24-CR-0008" is the title of this agreement, and the only case name and number included within the agreement. (Dkt. No. 248-1). This case name and case number, is the identifier of a docket, which at the time of this Opinion's publishing, contains 292 entries which provide the Court with a multitude of alleged facts and arguments from the Government, S. Charlemagne, and D. Charlemagne, and severed co-defendant Richardson. In expressly identifying this docket within the Immunity Agreement, the parties incorporated the contents of the case's docket within the four corners of the agreement. *See C & L Enters., Inc*, 532 U.S. at 419 (finding a contract's arbitration clause—stating that "all disputes arising out of the Contract shall be

---

[6] While *Nielsen* and *Johnson* provide the meanings of the indefinite article "an" and the definite article "the" in the context of statutory interpretation, these same plain meanings are widely used in contractual interpretation by other circuits and have been used by a sister district court within the Third Circuit. *See e.g. Post v. Killington, Ltd.*, 424 F. App'x 27, 29–30 (2d Cir. 2011); *Lubrizol Corp. v. Gray Ins. Co.*, No. 08-20289, 2009 WL 348820 at n. 2 (5th Cir. Feb. 12, 2009); *Illinois Union Ins. Co. v. Shefchuk*, 108 F. App'x 294, 302 (6th Cir. 2004); *Transamerica Ins. Co. v. South*, 125 F.3d 392, 399 (7th Cir. 1997); *Edgenet, Inc. v. Home Depot U.S.A.*, Inc., 658 F.3d 662, 666 (7th Cir. 2011); *Just Goods, Inc. v. Eat Just, Inc.*, No. 23-16100, 2024 WL 4850827, at *3 (9th Cir. Nov. 21, 2024); *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1174 (11th Cir. 2010); *Hermance v. M&T Bank Corp.*, No. CV 17-10552-SDW-SCM, 2018 WL 2230916, at *3 (D.N.J. May 16, 2018).

decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association"—expressly incorporated these rules into the agreement itself); *United States v. ITT Cont'l Baking Co.*, 420 U.S. at 238 (holding that the contents of an "appendix" setting forth the background leading to a complaint, and the complaint itself, were within the four corners of an agreement, as these documents were "incorporate[d] by reference.").

In trying to divine the meaning of "the subject matter" of *United States v. Davidson Charlemagne, et al.*, Case No. 24-CR-0008 as intended by the parties from within the four corners of the Immunity Agreement, more than one reasonable construction of the phrase is apparent. One reasonable construction of the "subject matter of the case" could encompass all evidence relevant to this case within the meaning of Rule 401 of the Federal Rules of Evidence.[7] A second reasonable construction of the "subject matter of this case" is the interactions of D&S Trucking, ISG, and VIHFA through their respective employees and representatives, as they relate to the building material storage contract. Yet another reasonable construction of the "subject matter of this case," in which all allegations have a financial component, is the alleged economic gains realized by the three Defendants whose criminal charges are at issue—D. Charlemagne, S. Charlemagne, and Richardson.

Because the phrase "the subject matter of this case," was clearly intended by the parties to have a specific meaning, and is susceptible to more than one reasonable interpretation, the Court must resolve the ambiguity, as discussed above, by looking to extrinsic evidence to determine the meaning the parties to the agreement intended it to have. *See e.g.*, *In re New Valley Corp.,* 89 F.3d

---

[7] Rule 401 provides in relevant part: that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *See Ford Motor Co. v. Summit Motor Prods.*, Inc., 930 F.2d 277, 301 (3d Cir. 1991) ("[I]n many cases, subjective testimony is very important, with results often hinging upon a jury's determination of witness credibility.").

at 150 ("[O]nce a contract provision is found to be ambiguous, extrinsic evidence must be considered to clarify its meaning."). Specifically, the Court relies on extrinsic evidence of the Government's and Anselmi's understandings as reflected in the representations of their respective counsel at oral argument on May 16, 2025 and Anselmi's own statements at the April 28, 2025 deposition.

The Government asserted at oral argument that the "subject matter of this case"—for which Anselmi is protected by the Immunity Agreement—is exclusively Anselmi's business dealings with Defendants in relation to the VIHFA building material contract. Notably, according to the Government, the Immunity Agreement does not cover any other alleged facts underlying the charges made in the SSI, including information pertaining to Anselmi's business dealings in relation to, and knowledge of, the VIHFA building material contract separate from his dealings with Defendants.[8]

The Government's narrow interpretation of the Immunity Agreement was confirmed when asked if testimony provided by Anselmi pursuant to the Immunity Agreement in this matter could be used against him in any other case—specifically the PPP case. In response, counsel for the Government asserted it could not, but only because the narrow subject covered by the Immunity Agreement would not be relevant to that matter. According to counsel for the Government, given the highly specific nature of the Immunity Agreement, the inclusion of a provision protecting Anselmi from the use against him in "any criminal matter" was intended by the parties to protect him in the Charlemagne matter, and from any future action that could be brought against him for his alleged participation in the crimes with which D. and S. Charlemagne are charged in the instant

---

[8] The Court notes that this results in any potential interactions Anselmi had with Richardson regarding the VIHFA building material contract being excluded from the coverage of the Immunity Agreement.

matter. The Government's assertion that any of Anselmi's testimony provided pursuant to this agreement could not be of relevance to essentially any separate matter provides further support for the Government's continued assertion that the Immunity Agreement is of very limited scope. Given the narrow, and highly specific scope the Immunity Agreement was intended to have, the Government argues that the Immunity Agreement would not protect any information about which Anselmi may testify regarding his hopes and beliefs of what benefits he may receive in the PPP case for his cooperation in the instant matter, as these would not be part of the intended definition of the "the subject matter of the case".

Counsel for Anselmi, representing the only other party to the agreement, confirmed that the interpretation as expressed by counsel for the Government was a mutual understanding. Anselmi's understanding of the "subject matter of this case," to which the Immunity Agreement is limited, is Anselmi's business relationship with D. Charlemagne. More specifically, counsel for Anselmi stated that Anselmi's answers to questions pertaining to the wood pile contract—how the contract was obtained, what type of work D. Charlemagne did as it related to the woodpiles, how much D. Charlemagne was paid for that work, Anselmi's business relationship with D. Charlemagne, and Anselmi's business dealings with D. Charlemagne—would all fall within the "subject matter of this case," and therefore under the Immunity Agreement. However, any questions Anselmi is asked as they may pertain to the PPP Indictment, including as to his understanding of potential sentences, regardless of their relevance to his bias in the instant matter, would not be included in the "subject matter of the trial," or protected by the Immunity Agreement. *Id.*[9]

_____

[9] At oral argument, Anselmi asserted, through counsel, that he has not received a written cooperation agreement, and therefore he may not be questioned as to his understanding of any benefits he may receive in relation to the PPP Indictment or any deal he may have made with the Government for his cooperation in the instant matter. Anselmi has provided no legal authority for the proposition that a written cooperation agreement is a prerequisite to asking questions about

The mutual understanding of the parties as to the limited nature of the Immunity Agreement is further reflected in the statements of Anselmi and the Government during the April 28, 2025 Rule 15 deposition. The Government began objecting at the first mention of the PPP Indictment on cross-examination, and consistently objected to questions relating to *U.S.A. v. Anselmi* until the deposition was terminated. (Dkt. No. 252-1 at 6). In addition, Anselmi appeared perplexed that questions about the PPP Indictment were being asked in the context of his Rule 15 deposition, and seemed to grow increasingly intolerant as the questions persisted. *See id*. at 17 ("By Mr. Cattie: Q. What is the nature of the charges that have been filed against you? . . . A. I think it's irrelevant to this case with Charlemagne.); (Dkt. No. 252-2 at 6) ("A. Well, that case is irrelevant to this one. Why do you keep bringing it up?"); (Dkt. No. 252-2 at 7) ("A. What are you just trying to defame me or what - - that's the whole issue --.)" Subsequently, both counsel for the Government and counsel for Anselmi objected to the PPP Indictment line of questioning, asserting Anselmi's Fifth Amendment privilege against self-incrimination. *Id*. at 11-12; Dkt. No. 252-3 at 1. By all indications, the parties to the Immunity Agreement did not intend to immunize Anselmi beyond the narrow scope articulated by counsel, thus excluding from the Immunity Agreement matters related to the PPP Indictment.

Taken together, the Court finds that the intent of the parties at the time they entered into the Immunity Agreement was to immunize Anselmi only as to testimony he may provide regarding his business dealings with Defendants in relation to the VIHFA building material contract. The Court will therefore accept this construction of the Immunity Agreement as the operative one.

---

benefits that a party may expect to receive from the Government, and the Court is aware of none. Therefore, the Court rejects this argument.

*Baldwin*, 636 F.3d at 75 ("The paramount goal of contract interpretation is to determine the intent of the parties.").

As Anselmi has been given immunity only as to a narrow area of testimony which does not include testimony encompassing motive and potential bias—which is unquestionably relevant under the circumstances here—Anselmi's grant of immunity is not coextensive with the scope of his privilege against self-incrimination. Rather than making it "perfectly clear" that the answers sought "cannot possibly" tend to incriminate, the Government has made very clear that any testimony Anselmi provides outside of the intended "subject matter" of this case, as discussed above, may be used against him in *U.S.A. v. Morris Anselmi*. *See United States v. Morton*, 993 F.3d at 204 (The Third Circuit finds it "easy to see why [Defendant] worried about self-incrimination" when asked questions pertaining to involvement in a drug conspiracy after she had accepted a plea agreement for drug trafficking which left open the possibility of further prosecution for related crimes.) Therefore, the *Hoffman* standard is met, and Anselmi is able to claim privilege against self-incrimination, as appropriate, pursuant to his Fifth Amendment right and refuse to provide testimony in the instant matter that violates that right. *See Hoffman*, 341 U.S. at 486–87.

### III.    Confrontation Clause and Areas of Inquiry

D. Charlemagne argues that "Anselmi's pending charges, and what he hopes to obtain for his cooperation is essential to the Charlemagnes having the opportunity for effective cross-examination into his motives and biases in testifying." (Dkt. No. 251 at 7). S. Charlemagne makes a similar argument to her co-defendant, stating that her interest is in eliciting testimony showing not only that "Anselmi ha[s] a motive to provide the specific testimony he has and will give in this case to obtain a favorable outcome of the Indictment under which he has been arrested, but also that he is motivated by avoidance of becoming an indicted coconspirator as to Count Twelve in

this case." (Dkt. No. 253 at 7). The Government counters that "the confrontation clause is not implicated in the PPP case as it is separate unrelated matter [] and [D]efendants' right to confrontation relates only to the case in which [they are] charged." (Dkt. No. 250 at 5). Anselmi himself has intervened in the instant matter and adds that he "strenuously object[s] to the extent any questions are asked about the specific facts of the allegations, their truthfulness, reliability of the allegations as these would violate [his] Fifth and Sixth Amendments rights." (Dkt. No. 270 at 6).

### A.    Legal Principles

"The Confrontation Clause of the Sixth Amendment requires a defendant to have some opportunity to show bias on the part of a prosecution witness." *United States v. Abel*, 469 U.S. 45, 50 (1984). The Supreme Court has permitted an attack on a "witness' credibility . . . by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). Such an attack may include questioning as to "whether [the witness] was biased" but also "to make a record from which to argue why [the witness] might have been biased of otherwise lacked that degree of impartiality expected of a witness at trial." *Id*. at 318; *see also U.S. v. Chandler*, 326 F.3d 210, 218-219 (3rd Cir. 2003) (quoting *Davis*, 415 U.S. at 316-17 ("[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.")).

"With respect to the cross-examination of cooperating witnesses who expect to obtain, or have obtained, a benefit from the government in exchange for their testimony, the critical question" in determining whether the defendant's Confrontation Clause rights have been upheld "is whether the defendant is allowed an opportunity to examine a witness' subjective understanding of his

bargain with the government, for it is this understanding which is of probative value on the issue of bias." *Chandler*, 326 F.3d at 220 (citation modified). In *Chandler,* the Third Circuit overturned a conviction, as the jury "would have had little reason to infer," from the limited cross examination permitted, that a witness' cooperation "might have meant the difference between more than eight years in prison, on the one hand, and the modest sentence he in fact received, on the other." *Id*. at 222. No particularized showing of harm by the defendant is needed to find a Confrontation Clause violation has occurred. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679-80 (1986).

Trial judges "retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Chandler*, 326 F.3d at 218-19 (3rd Cir. 2003) (quoting *Delaware*, 475 U.S. at 679). "In assessing whether a limitation on cross-examination violated the Confrontation Clause, we inquire into: (1) whether the limitation significantly limited the defendant's right to inquire into a witness's motivation for testifying; and (2) whether the constraints imposed fell within the reasonable limits that a district court has the authority to impose." *United States v. John-Baptiste*, 747 F.3d 186, 211–12 (3d Cir. 2014). In *John-Baptiste*, there was no violation of the defendant's Sixth Amendment right, as "[t]he District Court limited inquiry only into specific sentences that could have been imposed if the witnesses had refused to cooperate" and "allowed testimony regarding the witnesses' agreements to cooperate with the government and the fact that they expected to receive more lenient sentences in return." *Id*.

In *United States v. Taylor*, 127 F.4th 1008 (6th Cir. 2025), the defendant was permitted to cross-examine a witness about the witness' then-pending felon-in-possession charge and any potential benefits the witness would receive for his testimony, as these questions "went to [the

witness'] bias and motivation for testifying," and whether "preferential treatment" could be influencing a witness' testimony "constitutes core impeachment evidence." *Id*. at 1015. Further, the Sixth Circuit found that the trial court's holding that the defendant was not permitted to ask about "the nature of the conviction" was incorrect, as such a limited examination "could not reveal the penalties [the witness] faced for the charge, the penalty he received, and whether [the witness] sought or anticipated leniency in exchange for his cooperation in [the defendant's] prosecution." *Id*. at 1015-16. Therefore, the court found a Confrontation Clause violation had occurred. *Id*. at 1018.

Once a Confrontation Clause violation has been caused by a witness who asserts his or her Fifth Amendment Right on cross-examination, "the district court must ensure that the invocation did not effectively emasculate the right of cross-examination itself." *U.S. v. McGlory*, 968 F.2d 309, 344 (3rd Cir. 1992) (citation modified). "Courts often prevent an emasculation of the confrontation right by striking the testimony of a nonrespondent witness . . . Use of this remedy lies within the district court's discretion." *Id*.[10]

### B.    Analysis

As the Court has already concluded that Anselmi may assert his Fifth Amendment privilege against self-incrimination in this matter due to the narrow scope of his Immunity Agreement, the rulings below on Defendants' areas of inquiry do not address Anselmi's Fifth Amendment

---

[10] In *United States v. Chandler*, 326 F.3d 210, 225 (3d Cir. 2003), the defendant's conviction was overturned after failure to permit cross examination into witnesses' cooperation agreements with the Government. As the Court noted, "so much depended on the credibility of the cooperating witnesses, additional information about their motives in testifying might have proven decisive." *Id*.

objections. The privilege may be asserted as appropriate, consistent with the legal authority discussed above.

The Court's rulings below focus instead on the other objections made by the Government and Anselmi to Defendants' identified areas of inquiry. Obviously, the Court does not have before it the specific questions that will be posed. Rather, the Court's rulings are in response to general descriptions of subject areas. Thus, when questions are deemed warranted, including appropriate follow-up, the Court will necessarily rely on the rulings made herein together with the professionalism and good faith of the parties as they conduct deposition. While counsel's insistence on responsiveness to questions is appropriate under certain circumstances, counsel must also be mindful that witnesses are protected from harassment under Fed. R. Evid. 611(a)(3). Indeed, the Third Circuit has found an attorney's cross-examination of a witness to be improper when an attorney cuts the witness off without allowing the witness to answer the question posed; when an attorney asks the same substantive question multiple times with slight rephrasing; and when an attorney asks a follow-up question that is based on a fact pattern contrary to what the witness has testified. *Marshall v. Hendricks*, 307 F.3d 36, 74-76 (3d Cir. 2002).

Finally, by entering these rulings, the Court is not waiving its ability to review the entire deposition and render additional rulings in response to objections prior to trial. The proposed areas of inquiry and additional information regarding the rulings below are provided in the accompanying sealed Memorandum.

### 1.  Questions by D. Charlemagne

*D. Charlemagne Area of Inquiry 1:* Neither the Government nor Anselmi objects to this area of inquiry, and the Court deems it proper.

*D. Charlemagne Area of Inquiry 2*: The objections of the Government (Dkt. No. 272 at 1) and Anselmi (Dkt. No. 270 at 1) are sustained in part and overruled in part.

*D. Charlemagne Area of Inquiry 3*: The objections of the Government (Dkt. No. 272 at 2) and Anselmi (Dkt. No. 270 at 3-4) are sustained.

*D. Charlemagne Area of Inquiry 4*: The objections of the Government (Dkt. No. 272 at 2) and Anselmi (Dkt. No. 270 at 4) are overruled.

*D. Charlemagne Area of Inquiry 5*: The Government's objection (Dkt. No. 272 at 2) is sustained in part and overruled in part. Anselmi's objections (Dkt. No. 270 at 4-5) are overruled.

*D. Charlemagne Area of Inquiry 6*: The objections of the Government (Dkt. No. 272 at 2) and Anselmi (Dkt. No. 270 at 4) are overruled.

*D. Charlemagne Area of Inquiry 7*: The objections of the Government (Dkt. No. 272 at 2) and Anselmi (Dkt. No. 270 at 5) are sustained.

*D. Charlemagne Area of Inquiry 8*: The Government's objections (Dkt. No. 272 at 3) are sustained in part and overruled in part. Anselmi's objections (Dkt. No. 270 at 5-6) are overruled.

*D. Charlemagne Area of Inquiry 9*: The Government's objections (Dkt. No. 272 at 3) are overruled. Anselmi does not object to this area of inquiry.

*D. Charlemagne Area of Inquiry 10*: The Government's objection is overruled. (Dkt. No. 272 at 3). Anselmi does not object to this area of inquiry.

## 2.      Questions by S. Charlemagne

*S. Charlemagne Area of Inquiry 1*: The objections of the Government (Dkt. No. 272 at 3) and Anselmi (Dkt. No. 270 at 6-7) are sustained in part and overruled in part.

*S. Charlemagne Area of Inquiry 2*: The objections of the Government (Dkt. No. 272 at 3) and Anselmi (Dkt. No. 270 at 7) are sustained in part and overruled in part.

*S. Charlemagne Area of Inquiry 3*: The objections of the Government (Dkt. No. 272 at 3) and Anselmi (Dkt. No. 270 at 7) are sustained.

*S. Charlemagne Area of Inquiry 4*: The Government's objections (Dkt. No. 272 at 4) are overruled. Anselmi does not object to this area of inquiry.

*S. Charlemagne Area of Inquiry 5*: The Government's objections (Dkt. No. 272 at 4) are overruled. Anselmi's objections (Dkt. No. 270 at 7-8) are sustained in part and overruled in part.

*S. Charlemagne Area of Inquiry 6*: The Court's rulings on D. Charlemagne's identified areas of inquiry apply equally to S. Charlemagne.

*S. Charlemagne Area of Inquiry 7*: The Government's objection (Dkt. No. 272 at 4) is overruled. Anselmi does not object to this area of inquiry.

*S. Charlemagne Area of Inquiry 8*: The objections of the Government (Dkt. No. 272 at 4) and Anselmi (Dkt. No. 270 at 6-7) are sustained. Defendant's inquiries are limited as set forth, for example, in response to S. Charlemagne's Areas of Inquiry 1, 2, 5, 10, 11, 13, 14, and, 17.

*S. Charlemagne Area of Inquiry 9*: The Government's objections (Dkt. No. 272 at 4) are overruled. Anselmi's objections (Dkt. No. 270 at 8-9) are sustained in part and overruled in part.

*S. Charlemagne Area of Inquiry 10*: The Government's objections (Dkt. No. 272 at 4) are overruled. Anselmi's objections (Dkt. No. 270 at 8-9) are sustained in part and overruled in part.

*S. Charlemagne Area of Inquiry 11*: The Government's objections (Dkt. No. 272 at 4) are overruled. Anselmi's objections (Dkt. No. 270 at 9) are sustained in part and overruled in part.

*S. Charlemagne Area of Inquiry 12*: The objections of the Government (Dkt. No. 272 at 4) and Anselmi (Dkt. No. 270 at 9-10) are sustained.

*S. Charlemagne Area of Inquiry 13*: The objections of the Government (Dkt. No. 272 at 4) and Anselmi (Dkt. No. 270 at 10) are sustained.

*S. Charlemagne Area of Inquiry 14*: The Government's objections (Dkt. No. 272 at 4) are sustained in part and overruled in part. Anselmi does not object to this area of inquiry.

*S. Charlemagne Area of Inquiry 15*: The objections of the Government (Dkt. No. 272 at 5) and Anselmi (Dkt. No. 270 at 10) to Defendant's first question are sustained. The Government and Anselmi's objections to the remaining questions are overruled.

*S. Charlemagne Area of Inquiry 16*: The Government's objections are overruled. (Dkt. No. 272 at 5). Anselmi does not object to this area of inquiry.

*S. Charlemagne Area of Inquiry 17*: The objections of the Government (Dkt. No. 272 at 5) and Anselmi (Dkt. No. 270 at 7-8) are sustained in part and overruled in part.

*S. Charlemagne Area of Inquiry 18*: The objections of the Government (Dkt. No. 272 at 5) and Anselmi (Dkt. No. 270 at 10-11) are sustained.

*S. Charlemagne Area of Inquiry 19*: The objections of the Government (Dkt. No. 272 at 5) and Anselmi (Dkt. No. 270 at 11) are sustained in part and overruled in part.

*          *          *

The Government argues that allowing Anselmi to provide testimony in this matter while also asserting his right to remain silent on topics which could potentially be relevant to the charges brought against him in *U.S.A. v. Morris Anselmi* would not result in any Confrontation Clause implications, because *U.S.A. v. Morris Anselmi* "is [a] separate unrelated matter []and defendants' right to confrontation relates only to the case in which he is charged." (Dkt. No. 250 at 5). This argument is unavailing.

While the Government's assertion that "there are no references to or accusations against [the Charlemagnes] in the PPP case" is true, it does not follow that the "questions that the Defendants propose to ask regarding the details would serve no relevant purpose." (Dkt. No. 250 at 5).

As reflected in the Court's rulings on Defendant's areas of inquiry, the benefits Anselmi may receive in exchange for his testimony in this case, particularly in relation to the PPP Indictment, are relevant to his motivation and potential bias in providing testimony here, and therefore impact his credibility and the weight the jury might choose to assign to his testimony. Accordingly, Anselmi's cross-examination as to these potential benefits cannot be restricted on the grounds that it relates to an unrelated matter.

Nonetheless, Defendants' Sixth Amendment Confrontation rights to ask the above questions of Anselmi when he is presented as a witness against them do not negate Anselmi's own Fifth Amendment privilege to remain silent in the face of potential self-incrimination. In light of the narrowly defined Immunity Agreement the Government has provided, Anselmi may assert his Fifth Amendment right to remain silent in the course of his Rule 15 deposition as he deems appropriate, consistent with the applicable law. (Dkt. No. 270).

In Anselmi's response, he asserts his right to remain silent in the face of D. Charlemagne's areas of inquiry 5 and 8; and S. Charlemagne's areas of inquiry 1, 2, 5, 8, 11, 12, 13, 17, and 18. *Id*. The Court has determined, as detailed above, that D. Charlemagne's areas of inquiry 5 and 8 and S. Charlemagne's areas of inquiry 1, 2, 11, and 17 are appropriate areas of inquiry—albeit in some cases with limitations.  This presents a classic dilemma of constitutional rights, when the rights of some parties—S. and D. Charlemagne's Sixth Amendment right to confront a witness presented against them—conflicts with the rights of another party—Anselmi's Fifth Amendment right to remain silent. The Court concludes that the conflict is irreconcilable in light of the centrality to this case of Anselmi's credibility—given his role as a cooperating witness for the Government—and the extent to which his motive for testifying and potential bias bears on that issue.

In view of the forgoing, in the absence of a change in Anselmi's potential criminal exposure which would permit him to fully answer Defendant's cross-examination questions, as detailed above, without a legitimate fear of self-incrimination, the Court finds that the only remedy which preserves the rights of all three individuals—D. Charlemagne, S. Charlemagne, and Anselmi—is the exclusion of Anselmi's testimony from this matter. [11]

## IV.    Sealing

The Government argues that the record before the Court pertaining to Anselmi's deposition contains self-incriminating statements that he has made, and should be sealed.  (Dkt. No. 247 at 1-2). D. Charlemagne argues, as previously discussed, that there is no self-incrimination privilege at stake due to Anselmi's Immunity Agreement, and even if there were, any potential harm could be remedied through jury screening. (Dkt. No. 248 at 1-2). Further, both Defendants argue that the Government has not met the high burden resting with the moving party to show that sealing is necessary. (Dkt. No. 251 at 12, Dkt. No. 253 at 19).

However, at the hearing held in the instant matter on May 16, 2025, the Court gave an oral Order requiring, *inter alia*, Defendants D. Charlemagne and S. Charlemagne to file lists identifying the general subject areas on which they wish to cross-examine Anselmi during his deposition, which involve, pertain to, or make reference to the matter of *U.S.A. v. Anselmi* (24-cr-0004). Both Defendants then requested that such filings be placed under seal, at least pending the termination

---

[11] Some courts have found it appropriate to strike only a portion of a witness' testimony when the witness selectively invokes his or her Fifth Amendment right to silence, but this remedy is only available when the privilege has been invoked as to "collateral matters." *United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir.); *United States v. Lord*, 711 F.2d 887, 892 (9th Cir. 1983). In the Third Circuit "[b]ias is not generally considered a collateral issue because it is so intimately tied to the probative value of direct evidence in the case." *United States v. Patterson*, 68 F. App'x 351, 353 (3d Cir. 2003).

of *U.S.A. v. Charlemagne*, so as to preserve Defendants' trial strategies. Neither the Government nor Anselmi opposed this sealing.

### A.    Legal Principles

"The First Amendment right of access to criminal proceedings is firmly established." *United States v. Smith*, 123 F.3d 140, 146 (3d Cir. 1997). However, the right of public access to judicial records is not absolute. *United States v. Thomas*, 905 F.3d 276, 282 (3d Cir. 2018). A district court sealing a criminal record must make "particularized findings on the record in each case, (1) establishing the existence of a compelling governmental interest, and (2) demonstrating that absent limited restrictions upon the right of access, that other interest would be substantially impaired." *Id*. at 282 (citation modified). The burden of rebutting "the presumption of openness" lies with the proponent of the sealing. *United States v. Antar*, 38 F.3d 1348, 1362 (3d Cir. 1994). The party seeking to file a document under seal bears a "heavy burden." *Lampon-Paz v. Dep't of Homeland Sec.*, 532 F. App'x 125, n.3 (3d Cir. 2013). If the proponent does not set forth any information or evidence to satisfy his or her burden, then the request for sealing must be denied. *See United States v. Wilder*, No. CR 03-72, 2019 WL 1745794, at *1 (W.D. Pa. Apr. 18, 2019).

While the Court is aware of no Third Circuit precedent on the sealing of documents containing self-incriminating statements, a sister court within the Third Circuit has "offered to conduct an in-camera inquiry [of the relevant issue, and] seal information obtained during the inquiry" in a matter where defendants had expressed concerns that an evaluation of their financial eligibility for court-appointed counsel would violate their privilege against self-incrimination. *United States v. Sollenberger*, No. CRIM. 1:07-CR-205-01, 2008 WL 794949, at *2 (M.D. Pa. Mar. 24, 2008). Other Circuits have come to the conclusion that documents which are necessary for the Court to review, but which may include self-incriminating material, should be held under

seal. *See e.g. United States v. Anderson*, 567 F.2d 839, 840 (8th Cir. 1977); *United States v. Ellsworth*, 547 F.2d 1096, 1098 (9th Cir. 1976).

The issue of sealing documents which reflect attorneys' plans is well settled. The Third Circuit has found documents which "encompassed defendants' legal strategy" are within the "highly protected category of opinion work product." *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 87 (3d Cir. 1992), *as amended* (Sept. 17, 1992). In cases where such documents are at issue, "[b]ecause of the sensitivity surrounding the attorney-client privilege, care must be taken that . . . the matters covered by the exception be kept under seal or appropriate court-imposed privacy procedures until all avenues of appeal are exhausted." *Id.* at 97.

### B.     Analysis

As discussed above, Anselmi may be exposed to self-incrimination should he choose to give testimony in the instant matter, and may have already made statements in the course of his deposition which could be used against him in *U.S.A. v. Morris Anselmi*. Further, Defendants' filings containing their proposed deposition questions (Dkt. No. 264), and the Government's (Dkt. No. 272) and Anselmi's (Dkt. No. 270) respective responses contain elements of counsel's trial strategies—as does the portion of this Court's Memorandum Opinion that summarizes Defendants' cross-examination areas of inquiry and the responses thereto. Because the disclosure of the filings relevant to Anselmi's testimony in the instant matter may "substantially impair" both Anselmi's right against self-incrimination and Defendants' trial strategies, the burden for sealing has been met. Accordingly, Dkt. Nos. 250, 251, 252, 253, 264, 270, and 272 will remain under seal pending further Order of the Court.[12] In order to maintain the confidentiality of Defendant's trial strategy,

---

[12] At the oral argument which occurred on May 16, 2025, the Court found that the attachments to S. Charlemagne's Opposition at Dkt. No. 253—which comprised the entirety of the transcript of both of Anselmi's deposition sessions—were irrelevant to the issue of the scope of permissible

it is vital that the filings containing counsel's proposed areas of inquiry are sealed—specifically, the materials filed at Dkt. Nos. 264, 270, and 272, and the portion of this Opinion that describes and rules on counsel's proposed areas of inquiry. The information contained within these materials may not be shared with, communicated to, or in any way disclosed to Anselmi prior to the completion of the jury trial or other resolution of the instant matter.

## V.    CONCLUSION

For the above stated reasons, in the absence of a change in Anselmi's potential criminal exposure which would permit him to fully answer Defendant's cross-examination questions, as detailed above, without fear of self-incrimination, the Court finds that the only remedy which preserves the rights of all three individuals—D. Charlemagne, S. Charlemagne, and Anselmi—is the exclusion of Anselmi's testimony from the trial in this matter.

## ORDER

**UPON CONSIDERATION** of all written submissions filed in connection with the dispute that arose during the Fed. R. Crim. P. 15(a) deposition of Morris Anselmi, and the oral argument on May 16, 2025, it is hereby

**ORDERED** that in the absence of a change in Anselmi's potential criminal exposure which would permit him to fully answer Defendants' cross-examination questions—as detailed herein and in the accompanying sealed memorandum—without fear of self-incrimination, Anselmi's testimony is excluded from trial in this matter; and it is further

---

cross-examination when no party, nor the Court, had cited to them and they were not included in the parties' "Joint Delegation of Relevant Portions of the Deposition Transcripts." (Dkt. No. 252). Therefore, prior to any removal of the seal on Dkt. No. 253, the attachments matching this description—specifically, Dkt. Nos. 253-2, 253-3, 253-4, 253-6, 253-7, 253-8, 253-9, 253-13, 253-14, 253-15, 253-16, 253-17, 253-18, 253-19, 253-20—shall be stricken from the record. Because the Court has cited to Dkt. No. 253-5 within the Sealed Memorandum (Dkt. No. 295) accompanying this Memorandum Opinion and Order, it will not be stricken from the record.

**ORDERED** that Dkt. Nos. 250, 251, 252, 253, 264, 270, and 272 shall remain under seal pending further Order of the Court; and it is further

**ORDERED** that the portion of the instant Memorandum Opinion that describes and rules on counsel's proposed areas of inquiry shall be **SEALED** pending further Order of the Court; and if is further

**ORDERED** that counsel's proposed areas of inquiry shall not be shared with, communicated to, or in any way disclosed to Morris Anselmi prior to the completion of the jury trial or other resolution of this matter.

**SO ORDERED**.

Date: September 10, 2025                    _____/s/_____
                                            WILMA A. LEWIS
                                            Senior District Judge